******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# E. I. DU PONT DE NEMOURS AND COMPANY *v.*
## CHEMTURA CORPORATION
## (AC 45707)

Bright, C. J., and Alvord and Cradle, Js.

*Syllabus*

The plaintiff, D Co., sought, inter alia, to recover damages from the defendant
for breach of contract in connection with D Co.'s purchase of the defen-
dant's fluorine chemical business and related equipment, located in
Arkansas. The parties had previously entered into an asset purchase
agreement, pursuant to which the defendant agreed to indemnify D Co.
for any losses arising from a breach of the defendant's representations
and warranties in the agreement. The defendant's representations and
warranties related to the facility's prior and ongoing compliance with
various laws in connection with the operation of the defendant's plant
and to the good repair and condition of the transferred assets. Following
the purchase of the business, D Co. requested reimbursement, pursuant
to the agreement's indemnification provisions, to cure several alleged
deficiencies relating to, inter alia, four fire protection systems that were
allegedly in violation of the standards set by the National Fire Prevention
Association and incorporated by reference into the Arkansas State Fire
Code, and two refrigeration units that were allegedly leaking refrigerant
at an unacceptable rate. The parties ultimately were unable to settle their
differences, and D Co. brought its claims to the trial court. Thereafter,
C Co. was substituted as the plaintiff. The court rendered judgment for
the defendant on C Co.'s breach of contract claims, and C Co. appealed
to this court. *Held*:

1. C Co. could not prevail on its claim that the trial court failed to determine
   the applicable law and apply that law to the evidence to determine
   whether the fire protection systems at issue violated the Arkansas State
   Fire Code: the court's determination that the evidence was unclear as
   to which Arkansas State Fire Code applied to each fire protection system
   was not clearly erroneous, as, although C Co. argued that testimony
   from one of the defendant's former employees established time frames
   for the installation of each of the systems at issue, no evidence showed
   the actual installation date of any of the systems, the time frames pro-
   vided could have implicated any of four different versions of the Arkan-
   sas State Fire Code, and the court correctly determined that the applica-
   ble law would be the state fire code in effect at the time the systems
   in question were installed; moreover, C Co. failed to supply the court
   with a clear understanding of the Arkansas State Fire Code, which was
   the foreign law applicable to its claims, as C Co. provided only portions
   of certain National Fire Prevention Association standards and only one
   portion of one edition of a potentially applicable version of the Arkansas
   State Fire Code to the court, and it was not clear from the record which
   provisions of the state fire code C Co. alleged the defendant had violated
   as to the fire prevention systems at issue; furthermore, C Co. provided
   the court with no analysis as to whether the defendant's alleged failure
   to comply with National Fire Prevention Association standards consti-
   tuted a violation of the Arkansas State Fire Code.

2. C Co. could not prevail on its claim that the trial court erred in concluding
   that federal regulations did not require the replacement of certain
   refrigeration units that allegedly leaked ozone depleting substances at
   rates exceeding the regulatory (40 C.F.R. § 82.156) threshold: although
   there was evidence in the record that the refrigeration units in question
   were not in compliance with federal regulations in 2006 and 2007, which
   was within three years prior to closing as required by the agreement,
   C Co. failed to provide evidence addressing the reasons the units were
   replaced in 2012 and 2015 or to prove that the replacement damages
   resulted from the contractual violations, as there was testimony that
   repair efforts undertaken by the defendant may have been successful,
   and the regulations set forth the option to repair a leaking refrigeration
   unit, rather than requiring that the unit be replaced; moreover, C Co.'s
   claim that the court erred in finding that it failed to prove that the 2006

and 2007 leak rates were the exclusive cause of the replacement of the refrigeration units, rather than a proximate cause, was unsupported by a fair reading of the court's decision, as nowhere in its decision did the court hold, explicitly or implicitly, that the plaintiff was required to prove that the leak rates were the exclusive cause of the eventual replacement of those units in 2012 and 2015; furthermore, C Co. failed to provide expert testimony establishing that the 2006 and 2007 leaks, rather than the faulty performance of the units in subsequent years, led to the need for their replacement, as the evidence presented at trial indicated that refrigeration units were to be selected for replacement on the basis of type of refrigerant used, system maintenance costs, remaining life and system capacity considerations.

Argued October 17, 2023—officially released January 23, 2024

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where The Chemours Company FC, LLC, was substituted as the plaintiff; thereafter, the case was tried to the court, *Brazzel-Massaro, J.*; judgment for the defendant, from which the substitute plaintiff appealed; thereafter, the Supreme Court reversed the trial court's judgment and remanded the case to that court for further proceedings; subsequently, the court, *Schuman, J.*, rendered judgment for the defendant, and the substitute plaintiff appealed to this court. *Affirmed.*

*Daniel J. Krisch*, with whom were *Jennifer L. Morgan*, and, on the brief, *Julie A. Lavoie* and *Joy C. Fuhr*, pro hoc vice, for the appellant (substitute plaintiff).

*Brian J. Wheelin*, with whom, on the brief, was *Joseph L. Clasen*, for the appellee (defendant).

*Opinion*

CRADLE, J. This breach of contract case, which was commenced by the plaintiff, E. I. du Pont de Nemours and Company (DuPont),[1] in 2014, was first tried to the trial court in 2018, after which the court rendered judgment in favor of the defendant, Chemtura Corporation, on the ground that DuPont failed to strictly comply with the notice provisions of an asset purchase agreement (APA) between the parties. Our Supreme Court reversed the judgment of the trial court and remanded the case for further proceedings on the breach of contract claims. See *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, 336 Conn. 194, 218, 244 A.3d 130 (2020). Following its review of the record from the first trial and further briefing from the parties, the court rendered judgment in favor of the defendant. On appeal, the plaintiff claims that (1) the court erred in rejecting its breach of contract claims as to certain fire protection systems in that it failed to determine the applicable law and apply that law to the evidence to determine whether those fire protection systems violated the Arkansas State Fire Code, and (2) the court misinterpreted the applicable federal regulations and improperly concluded that those regulations did not require the replacement of certain refrigeration units that leaked ozone depleting substances at rates exceeding the statutory threshold for several consecutive years.[2] We affirm the judgment of the trial court.

The following undisputed facts and procedural history, as set forth by our Supreme Court, are relevant to the plaintiff's claims on appeal. "In 2007, the parties, DuPont and the defendant, negotiated the purchase of the defendant's fluorine chemical business and related equipment located in El Dorado, Arkansas. On behalf of DuPont, Brian Engler negotiated the terms of the APA with Arthur Fullerton, the defendant's associate general counsel, and Arthur Wienslaw, the defendant's director of strategy and licensing. The parties ultimately entered into the APA on December 14, 2007. Because the parties were competitors in this field, DuPont's precontractual ability to inspect the defendant's plant and equipment and to conduct other due diligence was limited. Officials of DuPont conducted only one brief, after-hours tour of the plant prior to signing the APA. As a result, the defendant made certain representations and warranties in the APA, including that the transferred assets were in good repair and condition and were sufficient to conduct business as of the closing date, and that the business had been and was currently being operated in accordance with applicable laws.

"To further protect DuPont, given its limited ability to inspect the plant, the parties also entered into a side letter dated January 31, 2008, which confirmed 'additional understandings' of the parties. The side letter included the disclosure and discussion of all poten-

tial violations of codes and regulations that controlled the operation of the plant and its products, including potential violations of the ozone depleting substances regulations.[3] The side letter primarily addressed any past deficiencies or violations that continued to impact the operation of the plant at the time of closing that DuPont would not have been able to discover given its limited inspection of the plant. The parties closed the sale on January 31, 2008.

"The APA contains two provisions, §§ 3.16 and 3.17, that set forth a number of representations and warranties by the defendant related to the facility's prior and ongoing compliance with various laws in connection with the operation of the plant. Under article 8 of the APA, the defendant agreed to indemnify DuPont from any losses arising from any breach of those representations or warranties.[4] Section 8.4 (a) of the APA provides a four year time period for indemnification as a result of a breach of the representations or warranties contained in §§ 3.16 and 3.17 and requires that DuPont notify the defendant in writing within four years of the closing date, 'specifying the amount and factual basis of that claim in reasonable detail to the extent known.' The APA's notice provision, § 11.4, provides in relevant part: 'All notices, consents, waivers and other communications under this [a]greement must be in writing and will be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a party may designate by notice to the other parties) . . . .' To properly notify the defendant, § 11.4 of the APA provides that the notice shall be sent to the defendant's general counsel 'with a simultaneous copy' to the defendant's outside counsel, Baker & McKenzie, LLP.

"Following the closing, the parties remained in regular contact because DuPont purchased only a portion of the Arkansas facility and the defendant continued to operate the remainder. Specifically, DuPont's plant manager, Donald Kuhlmann, communicated with Fullerton, the defendant's associate general counsel, and Frank DiCristina, one of the defendant's plant managers. DuPont did not communicate with the defendant's general counsel. DuPont subsequently discovered that certain areas of the plant required repair or replacement, and DuPont requested reimbursement pursuant to the defendant's indemnification obligations. Namely, DuPont asserted that certain refrigeration units were leaking refrigerant at an unacceptable rate, and the fire

suppression systems were not operating within applicable laws at the time of the purchase. From the closing in 2008 until 2011, the parties held discussions and corresponded to resolve those deficiencies.[5] During this time, in March, 2009, the defendant filed for Chapter 11 bankruptcy. For the reorganized company to assume the APA, the defendant had to cure any prebankruptcy defaults under the APA. See 11 U.S.C. § 365 (b) (2006). This led to extensive negotiations between the parties over 'cure claims.'[6] Ultimately, the parties summarized their positions on various items in a claims list, which included, among other things, the refrigeration and fire suppression system claims. These discussions did not resolve all of the claims, and the present action followed.

"DuPont commenced this action in June, 2014, asserting two claims sounding in breach of contract against the defendant. The complaint alleged violations of the side letter and §§ 3.16 and 3.17 of the APA. DuPont alleged that, in accordance with the APA and the side letter, the defendant is obligated to repair or replace refrigeration units that either are not properly working or violate applicable regulations, as well as certain fire suppression systems that did not comply with the applicable laws at the time of the sale. Specifically, in count one, DuPont alleged that the defendant breached the APA because, at the time of closing, the defendant had been operating nine areas of the plant in violation of applicable fire safety laws and regulations. Count two alleged that multiple refrigeration units were leaking refrigerant at rates impermissible under applicable environmental law.

"After three and one-half years of pretrial litigation, the case was tried in January, 2018. On the last day of trial, the defendant claimed—for the first time, in a motion for a directed verdict—that DuPont failed to provide notice in accordance with the terms of the APA. The defendant argued that DuPont did not comply with the APA's notice provision because it had been communicating with the defendant's associate general counsel rather than the general counsel. The court requested briefing on the issue, and the plaintiff and the defendant submitted posttrial briefs. The plaintiff and the defendant agreed that, under § 11.16 of the APA, New York law governs this dispute. The defendant argued that New York law requires strict compliance with notice provisions in a contract and that the plaintiff failed to prove all the elements of breach of contract. The plaintiff disagreed and argued that New York law did not require strict compliance, and that the claims list and the correspondence between the parties to the APA satisfied New York law because they provided the defendant actual notice.

"The trial court determined that at no time after the closing did DuPont provide notice in accordance with

§ 11.4 of the APA. The court noted that a number of the plaintiff's exhibits submitted as proof of actual notice did not rise to the level of actual notice of a violation of the contract purchase provisions." (Footnotes in original.) *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, supra, 336 Conn. 196–201. Our Supreme Court reversed the judgment of the trial court on the notice issue and remanded the case for further proceedings on the plaintiff's breach of contract claims. Id., 217–18.

On remand, the parties agreed to submit the case to a different judge for adjudication based on the record from the first trial, including all testimony and exhibits. Following its review of that record, in addition to briefs filed by both parties, the court, *Schuman, J.*, issued a memorandum of decision wherein it rendered judgment for the defendant on both of the plaintiff's breach of contract claims. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff first claims that the court erred in rejecting its breach of contract claim as to the fire protection systems in that it failed to determine the applicable law and apply that law to the evidence to determine whether those fire protection systems violated the Arkansas State Fire Code. We disagree.

The following additional procedural history is relevant to our consideration of this claim. In count one of its complaint, the plaintiff alleged that, in 2008, following the transfer of ownership of the subject property, DuPont conducted a fire assessment to determine whether the plant was compliant with applicable fire protection laws. The assessment and associated report (FPA report) concluded that the defendant had been operating the business in violation of applicable fire safety laws at the time of the sale.[7] The plaintiff alleged that the assessment revealed "at least nine violations of the National Fire Protection Association (NFPA) codes" in that the fire protection systems "did not comply with NFPA §§ 13 (Standard for Installation of Sprinkler Systems), 24 (Standard for Installation of Private Fire Service Mains), 45 (Standard on Fire Protection for Laboratories Using chemicals),[8] 58 (Liquefied Petroleum Gas Code) and 101 (the Life Safety Code) . . . . These provisions of the NFPA, which Arkansas has adopted as its Fire Prevention Code, have been in place since 1982."

At trial, the plaintiff sought damages for money spent replacing four fire protection systems that allegedly were in violation of the standards set by the NFPA and incorporated by the Arkansas State Fire Code: (1) the deluge valve house for the ethylene storage tank; (2) the deluge valve house for the TFP process;[9] (3) the deluge sprinkler system for the FM 200 Therminol 66

heater and tank;[10] and (4) the safety equipment for the TFP railcar loading station.

On January 14, 2022, following remand from the Supreme Court, the plaintiff filed a motion in limine asking the court to take judicial notice of NFPA 13 (1989), NFPA 58 (1989) and NFPA 101 (1988), which were incorporated by reference into the 1992 edition of the Arkansas State Fire Code that had been admitted into evidence at the first trial. In that motion, the plaintiff also asked the court to take judicial notice of "the 1965 Arkansas Fire Prevention Code and NFPA Codes 13 [1964] and 101 [1963] incorporated therein," purporting to demonstrate that "the applicability of NFPA Codes to the fire safety equipment at the plant and that the principles material to the issues in this case pertaining to NFPA 13 and NFPA 101 have remained constant since 1965." Finally, the plaintiff asked the court to take judicial notice of NFPA 13 (1978), NFPA 58 (1974) and NFPA 101 (1973). After hearing argument from both parties, the court, *Pierson, J.*, granted the plaintiff's motion in the "limited sense" that it took judicial notice only of "the 1992 Arkansas State Fire Code, which adopts and incorporates certain NFPA provisions . . . ." The plaintiff had introduced into evidence, at the 2018 trial, thirty-two pages from the 1992 Arkansas State Fire Code. The plaintiff attached to its motion in limine four pages from NFPA 13 (1989), six pages from NFPA 58 (1989) and seven pages from NFPA 101 (1988).[11]

On April 29, 2022, the plaintiff filed with the trial court a document titled "Plaintiff's Statement of Law and Legal Theories of the Case," wherein it alleged, inter alia, that "[t]he 1992 Arkansas State Fire Code incorporates by reference NFPA 13 (1989), NFPA 58 (1989) and NFPA 101 (1988), all of which were in effect at the time that [the defendant] installed and established the TFP and FM200 fluorine businesses acquired by DuPont."

On June 28, 2022, the plaintiff filed a posttrial brief setting forth, inter alia, its claimed violations of the NFPA as to each of the four fire protection systems at issue.[12] The plaintiff attached to its posttrial brief five additional pages from NFPA 13 (1989),[13] five pages from NFPA 101 (1988) and four pages from NFPA 58 (1989).[14]

In its July 18, 2022 memorandum of decision, the court began its consideration of the plaintiff's fire protection claims by noting that the "parties agreed, and the court finds, that the 'applicable law' is the state fire code in effect at the time that the system in question was installed." The court explained, however, that "[t]he initial difficulty for the plaintiff is that the evidence ranges from unclear to completely missing as to when the defendant installed each of the four systems at issue. The testimony was that the defendant installed the TFP process . . . 'around 1998' . . . or that the

plaintiff authorized the project in 1998 and installed it 'shortly thereafter.' . . . For the FM 200 Therminol 66 heater and tank . . . the evidence is that the defendant installed the system some undefined time after it ceased making the chemical halon at the end of 1994. . . .

"The related problem in these two cases is that it is not clear what Arkansas [State] Fire Code applies. There is a 1992 Arkansas [State] Fire Code in the record, which might have been applicable at the time of the installation of these two systems. . . . But there were subsequent Arkansas [State] Fire Codes promulgated in 1999, 2002, and 2007, all of which predated the APA and some or all of which could, alternatively, have been the applicable code at the time of installation of each of these two systems. . . .

"Without knowing what version of the state fire code applies, the court cannot determine the applicable NFPA standards. The 1992 code refers to the 1989 NFPA standards for the installation of sprinkler systems, but it is not clear that the 1992 code applies. . . . And it is uncertain whether subsequent codes refer to the 1989 standards or later standards, the contents of which are unknown.

"The final difficulty is that a violation of NFPA standards is not necessarily a violation of the state fire code. The 1992 Arkansas [State] Fire Code provides: 'Where provisions of this Code do not apply to specific situations involving the protection of life and property from the hazards of fire, smoke and explosion, compliance with nationally recognized standards or publications listed in this chapter, when not in conflict with provisions of the Building Code, shall be evidence of compliance with this Code.' . . . The plaintiff provides no analysis or evidence addressing the questions of whether provisions of the code apply to the specific situations at issue, whether the NFPA standards are in conflict with the Code, and whether a violation of the standards is automatically a violation of the Code, rather than merely evidence of noncompliance. For all these reasons, the plaintiff has failed to prove, with respect to the deluge valve house for the TFP process and the FM 200 Therminol 66 heater and tank system, that the defendant violated 'applicable law' and therefore breached its contract.

"This conclusion is even more obvious for the remaining two systems: the deluge valve house for the ethylene storage tank and the railcar loading station. There is no evidence at all concerning when the [defendant] installed these two systems. Thus, the applicable law is simply unknown." (Citations omitted; footnotes omitted.)

On appeal, the plaintiff argues that the trial court "had the necessary information to determine and apply the applicable law and was statutorily required to do

so" and, alternatively, that the fire systems at issue violated all potentially applicable editions of the Arkansas State Fire Code. We address each of these arguments in turn.

In arguing that the court had the necessary information to determine the applicable law, the plaintiff argues that, "[w]hile the defendant failed to produce evidence establishing with particularity when it constructed each system, there is sufficient evidence in the record to establish the time frames for construction such that the court can determine which Arkansas [State] Fire Code applies to each system." The plaintiff contends that the court's determination that the evidence was unclear was clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 464, 165 A.3d 1124 (2017).

In support of its argument that the evidence adduced at trial demonstrated that the 1992 Arkansas State Fire Code applies to each system at issue, the plaintiff addresses separately each of the four fire systems at issue: the deluge valve house for the ethylene storage tank, the deluge valve house for the TFP process, the TFP railcar loading station and the FM200 Therminol 66 heater and tank. As to the deluge valve house for the ethylene storage tank, the deluge valve house for the TFP process and the TFP railcar loading station, the plaintiff cites to the same two or three pages of deposition or trial testimony of Gregory Barron, a former employee of the defendant. In the portion of testimony cited by the plaintiff, Barron testified that he could not remember exactly when those systems were installed but that it would have been sometime after 1998. The court cited to this very testimony in finding that the evidence as to the dates of construction was unclear. Likewise, as to the FM200 Therminol 66 heater and tank, the plaintiff cites to Barron's testimony indicating that it was installed sometime after 1994. The court also cited to that testimony in finding that the evidence as to the date of construction was unclear. Although the plaintiff is correct in that the evidence established "time frames" for the installation of the fire protection systems at issue, the court aptly noted that those time frames could have implicated any of four different editions of the Arkansas State Fire Code, 1992, 1999, 2002 or 2007. Because the evidence did not assist the court in ascertaining the dates of installation of those systems, and, thus, identifying the applicable law, the court's characterization of that evidence as unclear was not erroneous.

The plaintiff nevertheless contends that the court

erred in rejecting its fire protection claims because the fire protection systems at issue violated every potentially applicable version of the Arkansas State Fire Code. It is well settled that, "if a party wants the court to take judicial notice of foreign law, it is that party's responsibility not only to bring the statutory law to the attention of the court in the proper manner, but also to inform the court, through proper means, of the meaning or construction of the law by courts of that foreign jurisdiction. Matter which it is claimed the court should judicially notice should be called to its attention by the party seeking to take advantage of the matter so that, if there is ground upon which it may be contradicted or explained, the adverse party will be afforded an opportunity to do so. . . . Where another jurisdiction's law is applicable, it is the duty of counsel to supply the court with a clear understanding of that foreign law." (Citations omitted; internal quotation marks omitted.) *Pagliaro* v. *Jones*, 75 Conn. App. 625, 634–35, 817 A.2d 756 (2003).

Our thorough review of the record reveals that the plaintiff failed to supply the court with a clear understanding of the foreign law that is applicable to its claims—the Arkansas State Fire Code.[15] The flaws of the plaintiff's argument that the fire protection systems at issue violated every potentially applicable edition of the Arkansas State Fire Code are multifold and can be gleaned by examining the portion of the 1992 Arkansas State Fire Code that the plaintiff introduced into evidence. As noted previously, the plaintiff submitted to the court thirty-two pages of the 1992 Arkansas State Fire Code. Those thirty-two pages include fifteen pages from Chapter 3, which is titled "Recognized Standards and Publications." Section 301, titled "General," provides: "Where provisions of this Code do not apply to specific situations involving the protection of life and property from the hazards of fire, smoke and explosion, compliance with nationally recognized standards or publications listed in this chapter, when not in conflict with provisions of the Building Code, shall be evidence of compliance with this Code."[16] Following that explanation is the list of those standards or publications, which includes specific NFPA provisions, the year of enactment of those specific provisions and the corresponding section of the Arkansas Fire Code to which each of those NFPA provisions applies. For example, the list includes "[NFPA] 13 Installation of Sprinkler Systems, 1989," and the corresponding sections of the Arkansas State Fire Code are §§ 2203.1.15.1, 2203.12.2.3 and 2204.1.17. The plaintiff did not submit for the record those sections of the Arkansas State Fire Code. The list also includes "[NFPA] 58 Storage and Handling of Liquified Petroleum Gases, 1989," and the listed corresponding sections of the Arkansas State Fire Code are §§ 1701.4.1, 1701.4.4 and T2201.2.2. The plaintiff did not submit for the record those sections of the Arkansas

State Fire Code. The list also includes "[NFPA] 101 Life Safety Code, 1988," and the listed corresponding section of the Arkansas State Fire Code is § 801.2. The plaintiff did not submit for the record this section of the Arkansas State Fire Code. Rather, the only substantive portions of the 1992 Arkansas State Fire Code submitted by the plaintiff is a portion of Chapter 6, specifically §§ 601.1 through 603.19.5. Nowhere in those sections, which comprise ten pages, are NFPA 13, 58 or 101 expressly referenced. It is therefore not clear from the record which provisions of the Arkansas State Fire Code the plaintiff is alleging the defendant violated as to the fire protection systems at issue. Moreover, because the Arkansas State Fire Code does not incorporate all NFPA standards, each edition may have incorporated different NFPA standards. Without examining all of the potentially applicable versions of the Arkansas State Fire Code, which were not provided to the court, there was no basis on which the court could have determined that the fire protection systems at issue violated all of them.

Moreover, the trial court was correct in that it is not clear, on the basis of the record in this case, that a failure to comply with an NFPA provision constituted a violation of the Arkansas State Fire Code. For instance, in its complaint, the plaintiff cited to the violation of NFPA 13 cited in the FPA report as to the deluge valve. According to the FPA report, "NFPA 13 states the following requirement: 'With deluge systems, the deluge valve should be located as close as possible to the hazard protected, outside any fire or explosion hazard area.' " That language on which the FPA report relies[17] is contained in § B-5-1.2 of Appendix B to NFPA 13. It is clearly stated in NFPA 13, however, that "[t]he Appendix is not a part of this NFPA Standard for the Installation of Sprinkler Systems but is included for information purposes only."[18] The plaintiff provided the court with no analysis as to whether a failure to comply with this language, which explicitly was not a part of the NFPA standard, constituted a violation of the Arkansas State Fire Code.[19]

The court explained: "The court can and will take judicial notice of the existence of these subsequent state fire codes. See General Statutes § 52-163a (a). But it is the plaintiff's burden to prove the 'applicable law' under the APA, and the court will not speculate as to which code applies or attempt to determine the provisions of that code on its own. . . . The parties dispute whether the standards vary over the years. The court cannot resolve this dispute without seeing the actual standards that apply." We agree with the court's determination that the plaintiff failed to supply it with a clear understanding of the law on which its claims are based. Throughout the course of this litigation, the "applicable law" that the plaintiff has alleged that the defendant failed to abide has been a proverbial moving target,

ultimately ending with the plaintiff's "catchall" position that the defendant violated every potentially applicable version of the Arkansas State Fire Code. The plaintiff, however, did not provide the court with those versions, leaving the court to figure that out for itself. The plaintiff submitted to the court only portions of certain NFPA standards on which it, at times, has relied and only one version of a portion of one edition of the Arkansas State Fire Code. As this court has explained, "[a]t bottom, [i]t is not the court's duty, unaided by the [plaintiff], to scour the annals of the law of [foreign jurisdictions] . . . in an effort to locate or to fashion a hook upon which [the plaintiff's claim] can be hung." (Internal quotation marks omitted.) *Olson* v. *Olson*, 214 Conn. App. 4, 19, 279 A.3d 230, cert. denied, 345 Conn. 918, 284 A.3d 299 (2022). On the basis of the foregoing, we cannot conclude that the court erred in rejecting the plaintiff's fire protection claims.

II

The plaintiff also claims that the court erred in rejecting its claim for damages to replace the refrigeration units at the plant. Specifically, the plaintiff argues that the court misinterpreted the federal regulations and improperly concluded that it was not necessary to replace refrigeration units that leaked ozone depleting substances at rates exceeding the statutory threshold.[20] We are not persuaded.

In rejecting the plaintiff's refrigeration claims, the court reasoned: "The plaintiff claims a breach of contract because two refrigeration [units] leaked refrigerant regularly and excessively despite numerous repairs and ultimately required replacement in 2012 and 2015 at [a] total cost of $508,698.68. The plaintiff's brief, however, is not clear on precisely what contractual provision the defendant allegedly breached. It appears from a generous reading of the brief that the plaintiff is claiming that the refrigerant leaks violated United States Environmental Protection Agency (EPA) regulations, which in turn constituted a breach of the defendant's warranty in the January, 2008 APA that '[t]he Business and Transferred Assets, are, and for the last three years have been, in compliance with, and are not subject to any liability under, any Environmental Law.' . . .

"There is, in fact, evidence that the defendant's refrigeration units were not in compliance with federal regulations during the three years prior to closing. In a January, 2008 letter to the EPA, Great Lakes Chemical Company (GLCC), a subsidiary of the defendant, disclosed 'its discovery of violations under the ozone depleting substances regulations, 40 CFR § 82 ("ODS regulations")' at the 'South Plant.'[21] The letter admitted that GLCC had 'failed to follow the recordkeeping requirements in the ODS Regulations and that there have been, or may have been, other instances of failure

to verify repairs under the ODS Regulations.' The letter noted 'some instances in which leak rates exceeded 35 [percent]' and acknowledged that there may have been 'emissions above permitted levels.' . . . There was also testimony confirming that these violations occurred in the refrigeration units. . . . An exhibit showed that refrigeration machine RU-86-802 had an annual leak rate of 52.08 percent in 2006 and that machine RU-86-807 had leak rates of 172.44 percent in 2006 and 152.24 percent in 2007. . . . Under the regulations, '[r]epairs must bring the annual leak rate to below 35 percent.' 40 C.F.R. § 82.156 (i) (1). . . . Therefore, the evidence does establish a probable violation of the defendant's warranty that its units 'are, and for the last three years have been, in compliance with, and are not subject to any liability under, any Environmental Law.'

"The more difficult question is whether the plaintiff proved that the replacement of these two units in 2012 and 2015 stemmed from the regulatory violations in 2006 and 2007. Under New York law, it is the plaintiff's burden to prove that 'the breach resulted in damages to the party claiming breach.' *Van Wie Chevrolet, Inc.* v. *General Motors, LLC*, 145 App. Div. 3d 1, 11, 38 N.Y.S.3d 662 (2016), leave to appeal denied, 28 N.Y.3d 913, 73 N.E.3d 358 (2017).

"An exhibit showed that these two units had annual leak rates that frequently exceeded 35 percent from 2008 on. . . .[22] But federal regulations generally do not require replacement of a leaking refrigeration unit. Instead, in the first instance, '[t]he owners or operators of industrial process refrigeration equipment normally containing more than 50 pounds of refrigerant must have leaks *repaired* if the appliance is leaking at a rate such that the loss of refrigerant will exceed 35 percent of the total charge during a 12-month period . . . .' (Emphasis added.) 40 C.F.R. § 82.156 (i) (2). Only if the first round of repairs are unsuccessful do the regulations create a qualified obligation on the owner to 'retrofit or retire the equipment.'[23] The qualification is that, if the owner successfully repairs the unit on a second try,[24] or establishes that the annual leak rate will not exceed 35 percent,[25] the regulations relieve the owner of the obligation to replace.

"The plaintiff's brief states that it replaced the two refrigeration [units] because they 'leaked R22 refrigerant at annual rates in excess of 35 percent,' they were 'undersized,' and 'attempts to repair the machine[s] so that [they] could be operated in accordance with ODS regulations were unsuccessful.' . . . A review of the authorities cited by the plaintiff for this proposition reveals that they do not support it. To the extent that there is any evidence addressing the reasons that the plaintiff replaced these two units, that evidence does not include leakage from 2006 and 2007 as a reason.[26] And there was no evidence that repairs were unsuccess-

ful. On the contrary, the testimony was that the repair efforts worked, if not on the first try, then on the second. . . .

"More specifically, it is simply unclear whether the need to replace these two units stemmed from the leaks in 2006 and 2007, which were the basis for the contractual breach, rather than the faulty performance of these units in subsequent years. The plaintiff did not present an expert on causation to establish this connection. Thus, the state of the record is that federal law did not require the plaintiff to replace these units, that the replacement decision could well have stemmed from the regular history of leakage after the closing, and that the real reason that the plaintiff replaced these units is unknown. Based on all [of] these factors, the court concludes that the plaintiff did not meet its burden to prove that the replacement damages resulted from the earlier contractual violations." (Citations omitted; footnotes added; footnotes altered; footnotes in original.)

On appeal, the plaintiff first claims that the court misinterpreted the federal regulations when it held that "federal regulations generally do not require replacement of a leaking refrigeration unit." In so claiming, the plaintiff ignores the court's explanatory sentences that follow, which set forth the option to repair such units prior to triggering the requirement to replace them, an option that the regulations clearly provide.[27] A full reading of the court's opinion reveals that the court did not misinterpret the federal regulations.

The plaintiff also challenges the court's determination that the plaintiff failed to prove that its replacement of the refrigeration units at issue was caused by the excessive leak rates in 2006 and 2007. "In order to prove a breach of contract cause of action, the plaintiff must prove that a defendant's breach was the proximate cause of its damages. . . . The damages for which a party may recover for a breach of contract are such as ordinarily and naturally flow from the non-performance. . . . In the law of contracts, as in torts, causation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage. . . . This test is satisfied if the defendant's actions would be thought of by people generally as having operated to an important extent in producing the harmful result. . . . It is not necessary that the breaches be the exclusive cause or the *sole* cause of the damages. . . . Damages must nevertheless be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Federal Housing Finance Agency* v. *Morgan Stanley ABS Capital I Inc.*, 59 Misc. 3d 754, 783–84, 73 N.Y.S.3d 374 (2018). "Generally, it is for the trier of fact to determine the issue of proximate cause. However, the issue of proximate cause may be decided as a matter of law

where only one conclusion may be drawn from the established facts . . . ." (Internal quotation marks omitted.) *Lola Roberts Beauty Salon, Inc.* v. *Leading Ins. Group Ins. Co., Ltd.*, 160 App. Div. 3d 824, 826, 76 N.Y.S.3d 79 (2018).

"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *AAA Advantage Carting & Demolition Service, LLC* v. *Capone*, 221 Conn. App. 256, 279–80, 301 A.3d 1111, cert. denied, 348 Conn. 924, 304 A.3d 442, and cert. denied, 348 Conn. 924, 304 A.3d 442 (2023).

In challenging the court's causation analysis, the plaintiff claims that the court erred in finding that the plaintiff failed to prove that the 2006 and 2007 leak rates were the exclusive cause of the replacement of the refrigeration units at issue and that, instead, it should have considered whether they were a proximate cause of the replacement of those units. This argument is not supported by a fair reading of the court's decision. Nowhere in its decision does the court hold, expressly or implicitly, that the plaintiff was required to prove that the 2006 and 2007 excessive leak rates were the exclusive cause of the eventual replacement of those units in 2012 and 2015. Accordingly, the plaintiff's claim that the court erred by applying the wrong legal standard is without merit.

The plaintiff also argues that "there is no question that the need to replace [the refrigeration units at issue] was a consequence that 'ordinarily and naturally flowed' from the fact that, when the defendant transferred the units, they had been leaking in excess of the statutory threshold for at least one or two years prior to the closing, without appropriate repairs (or records thereof), and continued to leak in excess of the statutory threshold for multiple years after the closing despite repair efforts." The plaintiff contends that, "[i]f the machines had not been perpetually leaking when DuPont acquired them, they would not need to be replaced." As the court noted, the plaintiff did not present expert testimony in support of these assertions. Indeed, as the court also noted, there was evidence presented at trial indicating that the refrigeration units "were to be selected for replacement based on (in order of priority) type of refrigerant used (HFC vs. HCFC), system maintenance costs and remaining life, as well as system capacity considerations." Accordingly, we cannot conclude that the court's determination that the plaintiff failed to

prove that the excessive leaking of refrigerant in 2006 and 2007 caused the 2012 and 2015 replacement of the refrigeration units was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] DuPont was the original plaintiff in this action. In 2017, The Chemours Company, FC, LLC, was substituted as the sole plaintiff. We hereinafter refer to the substitute plaintiff as the plaintiff throughout this opinion.

[2] The plaintiff also claims that it did not "receive the trial to which it was entitled on remand [in that] the trial court, *Schuman, J.*, neglected to examine all of the evidence anew, neglected to make the required legal determinations and adopted factual findings from the initial trial court, *Brazzel-Massaro, J.*, in spite of General Statutes § 51-183c, which provides that a case cannot be tried again by the same judge where there has been a reversal by our Supreme Court." The plaintiff argues that the court's "multi-page block quote [consisting of] approximately five pages of factual findings from the Supreme Court's decision in this case, which actually were factual findings of the original trial court judge" was "entirely improper and patently inconsistent with the rights conferred by § 51-183c." The plaintiff asserts that the court "abdicated both its role to determine and apply the law and its role as fact finder." Despite the gravity of these allegations, counsel for the plaintiff, at oral argument before this court, acknowledged that the facts quoted by the trial court from the Supreme Court's decision are undisputed historical facts and conceded that the plaintiff simply is arguing that the court's other factual findings as to the dates of installation of the fire equipment and the applicable fire codes were clearly erroneous. Our resolution of the plaintiff's first enumerated claim identified herein addresses this argument. Consequently, the plaintiff's claim based on a purported violation of § 51-183c warrants no further discussion.

[3] "The ozone depleting substances regulations regulate the leakage rates of ozone depleting substances, such as chemicals used in industrial process refrigeration equipment. See 40 C.F.R. § 82.156 (2019)." *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, supra, 336 Conn. 197 n.2.

[4] "Specifically, § 8.8 of the APA provides: 'A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party obligated to indemnify under this [a]greement. Such notice must be provided by the [i]ndemnified [p]erson to the [i]ndemnifying [p]erson promptly in writing describing the [l]oss incurred by the [i]ndemnified [p]erson, the amount or estimated amount thereof, if known or reasonably capable of estimation, and the method of computation of such [l]oss, all with reasonable specificity and containing a reference to the provisions of this [a]greement in respect of which such [l]oss will have occurred.' " *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, supra, 336 Conn. 198–99 n.3.

[5] "Specifically, in 2008, a site wide survey of the facility was completed, addressing various compliance issues. A copy of the audit report was forwarded to DiCristina. The report stated that the purpose was to 'inform [the defendant] of [a] preliminary estimate of expenses which DuPont plans to incur between now and the end of 2009, which will be invoiced to [the defendant] per the [APA] and the January 31, 2008 [s]ide [l]etter . . . .' In August, 2008, Kuhlmann and James Scroggins, one of the defendant's plant managers, also communicated about the refrigeration units. In September, 2008, correspondence between DuPont and the defendant outlined the scope of work required for the refrigeration units. Throughout 2009 and 2010, the parties continued to exchange e-mails and other correspondence about expenditures reimbursable to DuPont." *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, supra, 336 Conn. 199 n.4.

[6] "In an e-mail to DiCristina and Kuhlmann, Fullerton explained what the term 'cure claim' meant in the claims list he created: 'I've tried to . . . use the following criteria for putting something in the "cure claim" category for purposes of resolving this: assuming there is a tie-in to a reimbursement obligation under the [APA], has work been done for which either (a) an invoice has been generated and sent to [the defendant] or (b) the issuance of an invoice to [the defendant] is a [pro forma] step at this point [because] the amount that would appear on the invoice is [un]known? . . . [T]he fact that something may not be in the "cure claim" category does not mean it never gets paid; it just means that the claim is handled per the [APA] terms as if there had never been a [Chapter] 11 filing.' " *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, supra, 336 Conn. 199 n.5.

[7] The Fire Protection Assessment (FPA), which was prepared by members of DuPont's Safety Fire Protection and Environmental Engineering Group, indicated that, "[a]t the time the site was built, the fire protection code to be used was the 1982 Southeast Fire Protection Code. This version of the code required the use of [National Fire Protection Association (NFPA)] fire codes. Process additions, modifications and changes were made to a number of manufacturing processes at the site over time, including the installation of the TFPII process in 1998. Each project should have followed the NFPA code in place at the time of the respective project. . . . Below are detailed reviews and the recommendation for each of the respective areas, based on the Southeast Fire Protection Code and applicable NFPA fire codes. A Building Life Safety Code review is highly recommended if it has not already been performed. A building code review would cover construction requirements, egress, emergency lighting, access, fire walls/doors, etc." Neither the 1982 Southeast Fire Protection Code nor a Building Life Safety Code were ever submitted to the court.

[8] No portions of NFPA 24 or 45 were presented to the court.

[9] As set forth in the trial court's memorandum of decision, TFP stands for trifluoropropene, a flammable chemical.

[10] The trial court's memorandum of decision noted that the Therminol 66 heater and tank are used in a flammable process to manufacture FM 200, a liquified gas.

[11] Although the plaintiff submitted pages from the 1965 Arkansas Fire Prevention Code and additional editions of the NFPA, the court declined to take judicial notice of them.

[12] For example, the plaintiff claimed that the deluge valve violates NFPA 13 § 5-3.2 (1989). That subsection of § 5-3 (Preaction and Deluge Systems) is titled "Description" and provides in relevant part: "Preaction and deluge systems are normally without water in the system piping. The water supply is controlled by an automatic valve operated by means of fire detection devices and provided with manual means for operation that are independent of the sprinklers. . . ."

[13] The pages appended to the posttrial brief were completely different from those submitted with the motion in limine.

[14] The plaintiff attached to its posttrial brief two pages from NFPA 13 (1964) and five pages from NFPA 13 (1978).

[15] The plaintiff argues: "To the extent the court wanted to verify the parties' evidence that the NFPA standards have not materially changed during the relevant time frame, it should have reviewed the text of the NFPA provisions before it. Indeed, the court, *Pierson*, *J.*, expressly took judicial notice of the relevant NFPA standards incorporated into the 1992 Arkansas Fire Code (i.e., NFPA 13 (1989), NFPA 58 (1989) and NFPA 101 (1988)) . . . as well as earlier versions of these NFPA standards (i.e., NFPA 13 (1964 and 1978), NFPA 58 (1974) and NFPA 101 (1963)), incorporated into earlier editions of the Arkansas [State] Fire Code." (Citations omitted.) This representation of the record is not accurate. The court did not grant the plaintiff's motion in limine "insofar as it would take judicial notice of the requested materials, as the plaintiff represents." The record reflects that the court, *Pierson*, *J.*, took judicial notice only of "the 1992 Arkansas State Fire Code, which adopts and incorporates certain NFPA provisions . . . ." It did not take judicial notice of any earlier versions of the Arkansas State Fire Code or NFPA provisions. Furthermore, the court found that it was uncertain as to whether any versions of the code *after 1998* applied, and the plaintiff never asked the court to take judicial notice of such later versions of the code.

[16] The plaintiff never disclosed or addressed this prefatory language of the Arkansas State Fire Code and provided no evidence or argument that would support a determination that the NFPA provisions on which it relied were not in conflict with the Building Code.

[17] In its January 14, 2022 motion in limine asking the court to take judicial notice of certain NFPA provisions, the plaintiff cited to those same pages of the FPA report as the basis of its claimed violation of NFPA 13. The plaintiff cited to the same pages of the FPA report in its April 29, 2022 "Statement of Law and Legal Theories of the Case."

[18] The plaintiff did not provide to the court the portion of NFPA 13 that explained this; nor did the plaintiff inform the court that this language was contained in the Appendix and that it was not a part of the NFPA standard. This information was presented by the defendant through its introduction into evidence of a complete version of NFPA 13 (1978), which consists of more than 200 pages.

[19] Additionally, the testimony at trial revealed that there are exceptions

to the requirement that certain systems comply with the NFPA in that the "authority having jurisdiction" may consider exceptions as to the design and location of deluge valve houses.

[20] The plaintiff also challenges the court's determination that it failed to comply with the side letter's requirement that the parties "select a nationally recognized independent industrial refrigeration appliance expert" to mutually determine retrofit or replacement. The court explained: "It is undisputed that there was no 'mutual determination of the parties' on retrofit or replacement. Thus, the issue is whether there was compliance with the requirement that the parties 'select a nationally recognized independent industrial refrigeration appliance expert . . . .' The plaintiff hired Terry Dyer, a . . . refrigeration design expert [formerly employed by the defendant], for advice on refrigeration issues. Although it may seem that hiring an expert from the opposing party would conform to the opponent's wishes, there was no evidence to that effect and no indication that the defendant even participated in the selection process. Further, it is not clear that Dyer met the criteria of a 'nationally recognized independent industrial refrigeration appliance expert . . . .' The plaintiff's failure to comply with the side letter's procedural requirements in this respect provides an additional reason why it cannot recover for replacement of the refrigeration units."

In challenging the court's determination that it failed to comply with the requirements of the side letter, the plaintiff additionally argues that the court erred in requiring that it strictly comply with those requirements and, instead, should have employed a substantial compliance analysis. The plaintiff argues that it substantially complied by retaining Dyer. Even assuming, arguendo, that the proper standard is whether the plaintiff substantially complied with the requirements of the side letter, we are not persuaded by the plaintiff's substantial compliance argument. We instead conclude that the court's analysis was correct, whether the standard is strict or substantial compliance.

[21] "The APA identifies 'Plant Site' as the 'manufacturing site of Seller or GLCC known as 'Chemtura South Plant' with an address of 324 Southfield Cutoff, El Dorado, AR . . . .' "

[22] "For unit RU-86-802, annual leak rates were 100 percent in 2008, 45.42 percent in 2009, and 101.25 percent in 2011. For unit RU-86-807, annual leak rates were 100 percent in 2009, 115.38 percent in 2011, and 110.26 percent in 2012."

[23] "40 C.F.R. § 82.156 (i) (3) (ii) provides [in relevant part]: 'If the follow-up verification test indicates that the repairs to industrial process refrigeration equipment, federally-owned commercial refrigeration equipment, or federally-owned comfort cooling appliances have not been successful, the owner or operator must retrofit or retire the equipment . . . .' "

[24] "40 C.F.R. § 82.156 (i) (3) (iv) provides [in relevant part]: 'The owner or operator is relieved of the obligation to retrofit or replace the industrial process refrigeration equipment as discussed in paragraph (i) (6) of this section if second repair efforts to fix the same leaks that were the subject of the first repair efforts are successfully completed within 30 days or 120 days where an industrial process shutdown is required, after the initial failed follow-up verification test. . . .' "

[25] "40 C.F.R. § 82.156 (i) (3) (v) provides [in relevant part]: 'The owner or operator of industrial process refrigeration equipment is relieved of the obligation to retrofit or replace the equipment in accordance with paragraph (i) (6) of this section if within 180 days of the initial failed follow-up verification test, the owner or operator establishes that the appliance's annual leak rate does not exceed the applicable allowable annual leak rate . . . .' "

[26] "A 2012 memo from [DuPont] states that the [units] in question 'were to be selected for replacement based on (in order of priority) type of refrigerant used (HFC vs. HCFC), system maintenance costs and remaining life, as well as system capacity considerations.' "

[27] See footnote 23 of this opinion.